**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

CHELLEN CAVALIER,

          Plaintiff,

v.

BRANDT HOSPITALITY GROUP, INC.,

          Defendant.

CA No. 1:25-cv-00122

**Jury Trial Demanded**

## COMPLAINT

Plaintiff Chellen Cavalier ("Ms. Cavalier"), through her undersigned counsel, hereby brings this Complaint against her former employer Brandt Hospitality Group, Inc. ("Brandt") based upon Brandt's discrimination on the basis of age and sex and retaliation against Ms. Cavalier in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, *et seq.*), the Fair Employment Practices Act (R.I. Gen. Laws § 28-5-1, *et seq,*), the Rhode Island Civil Rights Act (R.I. Gen. Laws § 42-112-1, *et seq.)*, and the Rhode Island Whistleblowers' Protection Act (R.I. Gen. Laws § 28-5010, *et seq.*).  As a result, Ms. Cavalier has suffered severe emotional distress and other compensatory damages, lost wages and benefits, and lost future wages and benefits.  In support of this complaint, Ms. Cavalier avers as follows:

### Parties

1.     Ms. Cavalier is an individual and a resident and citizen of New York.

2.     Brandt is a North Dakota corporation with a principal office located at 2640 47th Street S, Fargo, ND 58104.  Brandt owns and operates the Residence Inn Lincoln-Providence located at 632 George Washington Highway, Lincoln, RI 02865.

**Facts**

3.      Between 2007 and 2018, Ms. Cavalier worked under Steve Martodam, the President and COO of Brandt, as a General Manager, Lead General Manager, Market Manager, and Area Director, at various companies.

4.      In December of 2019, Mr. Martodam recruited Ms. Cavalier to work for Brandt as the General Manager of the Residence Inn in Lincoln, RI.

5.      Given Ms. Cavalier's residence in New York and her extensive experience and exceptional performance in the past while working for Mr. Martodam, Mr. Martodam represented that Brandt intended to open a location in Poughkeepsie, NY and that Ms. Cavalier would ultimately serve as a Regional Manager overseeing Brandt's "empire on the east coast."

6.      Between December of 2019 and October of 2021, Ms. Cavalier worked under Brian Necastro, Brandt's Vice President of Operations.

7.      During that time, Mr. Necastro never required Ms. Cavalier to obtain his permission to issue any reprimands of any Residence Inn employees and was always thankful that, given Ms. Cavalier's extensive experience, she required little oversight.

8.      During her time as the General Manager of the Residence Inn, Ms. Cavalier received exceptional reviews, maximum raises, and no reprimands of any kind.

9.      Throughout that time, Mr. Martodam continuously updated Ms. Cavalier regarding the Poughkeepsie location including sending her pictures while it was being built and reiterating his intention to have her serve as a Regional Manager based out of that location.

10.     In October of 2021, Scott Latzke was hired to serve as Brandt's Regional Director of Operations and became Ms. Cavalier's immediate supervisor.

11.     Mr. Latzke was good friends with Mr. Martodam and, upon information

and belief, had a history of not working well with older female employees.

12. Almost immediately, Ms. Cavalier noticed that Mr. Latzke treated her unprofessionally and differently than he did male employees, including General Managers, and younger employees, including General Managers.

13. Mr. Latzke micromanaged Ms. Cavalier to an extent other General Managers and employees were not managed.

14. He was also verbally abusive and unprofessional to Ms. Cavalier, despite her excellent performance.

15. On November 8, 2022, Ms. Cavalier met with Mr. Martodam and Mr. Necastro (who were in Rhode Island to celebrate Ms. Cavalier's "numbers") and expressly told them that Mr. Latzke was harassing and verbally abusing her and that at least one male General Manager told her that Mr. Latzke treats her differently than he treats male General Managers.

16. Mr. Martodam and Mr. Necastro told Ms. Cavalier to extend an "olive branch email" to Mr. Latzke and that they would discuss the issue with Mr. Latzke.

17. Ms. Cavalier never heard back from them regarding that complaint.

18. On February 21, 2023, Ms. Cavalier had dinner with Mr. Latzke who cryptically told her that he had been fired from his prior job at Peachtree Hospitality Group "for not getting along with some woman" in a way that implied that he would not let that happen again.

19. On March 24, 2023, Ms. Cavalier called Mr. Martodam and again noted that Mr. Latzke was still harassing her and treating her differently than the male General Managers.

20. Mr. Martodam again stated he would discuss the issue with Mr. Latzke.

3

21.    Ms. Cavalier never heard back from him regarding that complaint.

22.    Despite the above, Ms. Cavalier's performance remained excellent and, in July of 2023, the Residence Inn won Brandt's Hotel of the Year over every other hotel in its portfolio.

23.    Despite this, and without any previous verbal or written warning or negative performance review, on August 30, 2023, Mr. Latzke met with Ms. Cavalier and issued a "final warning" accusing her of unfairly giving employees under her direction warnings for their conduct and/or performance without first getting his approval (the "Final Warning").

24.    This was the first time that anyone had ever told her that General Managers needed "approval" to reprimand their employees and, under her prior supervisor Mr. Necastro (who had since been promoted), she had never needed his approval to issue written reprimands.

25.    Specifically, Mr. Latzke accused her of not communicating to him that she was giving Michael Butler, an OPS Manager, a written reprimand back in 2022.

26.    Mr. Latzke claimed that Mr. Butler quit Brandt "because of the situation."

27.    This was not true and Mr. Latzke knew it was not true.

28.    While Ms. Cavalier did issue a reprimand, Mr. Butler was actively being investigated by Human Resources for manipulating timecards and elected to voluntarily quit before the investigation could be completed.

29.    In fact, Mr. Butler emailed Ms. Cavalier his two week notice expressly stating that he was quitting because of the investigation and thanked Ms. Cavalier for her mentorship and leadership.

30.     Ms. Cavalier's 2022 performance review (given to her in 2023) contained no reference to the situation with Mr. Butler.

31.     In the Final Warning, Mr. Latzke also alleged that Ms. Cavalier had unfairly terminated and unfairly issued a reprimand to the Sales Manager, Jean Macomber, without first communicating with him or HR.

32.     Specifically, Mr. Latzke alleged that Ms. Macomber was given an unreasonable timeline to accomplish a task (LNR's) and was then terminated only two business days after Ms. Cavalier issued her a corrective action.

33.     Once again, this was not true and Mr. Latzke knew it was not true.

34.     Ms. Macomber, who was only a probationary employee and therefore under Brandt policies subject to immediate termination, was a previous Marriott Sales Manager and, as such, she was very experienced in completing tasks like LNR's.

35.     After repeated conversations with Ms. Macomber during her very short tenure with Brandt regarding her failure to complete the LNR's, Ms. Cavalier issued a written reprimand on August 23, 2023.

36.     The following day, Ms. Cavalier called Mr. Latzke, Tenielle Schmidt, Brandt's Director of Human Resources, and Mr. Necastro to discuss the written reprimand.

37.     Mr. Latzke did not answer or call Ms. Cavalier back.

38.     During the completed calls with Ms. Schmidt and Mr. Necastro, Ms. Cavalier explained that besides the clear insubordination, Ms. Macomber had also been dishonest with Ms. Cavalier on several occasions regarding her need for transportation, an undisclosed vacation, and her schedule.

5

39.    Ms. Schmidt and Mr. Necastro were very supportive of the reprimand and raised no concerns about it whatsoever.

40.    They both also expressed that while they wished Ms. Macomber stayed employed with Brandt, they would support Ms. Cavalier with whatever she believed was necessary to do to the extent Ms. Macomber's performance did not improve, especially in light of the fact that she was still on probation.

41.    This was because, as long as Ms. Cavalier worked at Brandt, General Managers were authorized and expected to issue reprimands as necessary.

42.    In fact, Brandt's Employee Handbook expressly authorizes General Managers to do so.

43.    Moreover, despite Mr. Latzke's allegations, Ms. Cavalier did not fire Ms. Macomber two business days later based on her failure to comply with the written reprimand.

44.    On August 28, 2023, Ms. Cavalier and Chevoni Ormsby-Johnson, the Assistant General Manager, met with Ms. Macomber to discuss the LNR's and when they would be completed.

45.    During this meeting, Ms. Macomber expressly refused to complete the task and told them that despite the verbal communications and written reprimand, she was not going to complete the LNR's because, instead, she would be focusing on extended stay business "to get my bonus."

46.    Hoping to get her to recognize the gravity of her insubordination, Ms. Cavalier said that if she was not going to perform the specific tasks assigned to her by the General Manager and Assistant General Manager, and given her probationary status, perhaps "this is not going to work out."

6

47. Ms. Macomber immediately stood up, said she agreed, and made numerous disrespectful comments toward Ms. Cavalier as she gathered her belongings and left the property.

48. After his meeting with Ms. Cavalier, Mr. Latzke then emailed Ms. Cavalier that not only was she receiving the Final Warning, he was rescinding Brandt's offer to have Ms. Cavalier serve as the General Manager in Poughkeepsie, NY when it was open.

49. He did this in an effort to force Ms. Cavalier to resign her position as he knew that given her distance from Lincoln, RI, her continued employment was likely dependent upon the transfer.

50. The Final Warning and rescission of the transfer were issued because of Ms. Cavalier's sex and age and because she had previously alleged discrimination on the basis of sex and age.

51. Male and younger General Managers at Brandt have never been required to obtain approval before issuing a reprimand and have never had the underlying grounds for the reprimands reviewed to such an extent.

52. Ms. Cavalier has confirmed this fact with a number of General Managers at Brandt properties and they confirmed that they were never required to obtain approval before issuing a reprimand.

53. Moreover, male and younger employees in general are never given a "final warning" without any prior performance issues or reprimands.

54. In addition to the November 2022 and March 2023 complaints about Mr. Latzke, Ms. Cavalier believed that Brandt's and Mr. Latzke's treatment of her since October of

2021, when Mr. Latzke was hired, including the Final Warning, all stemmed from an incident that had taken place throughout 2021 with Adriana Carter, Ms. Cavalier's former Sales Manager.

55.    Ms. Carter had numerous performance issues for months and was the subject of numerous complaints by guests and her co-workers.

56.    Ms. Carter was no-showing to work without calling, was insubordinate to Ms. Cavalier, and had been late to work several times.

57.    In July of 2021, Ms. Cavalier was assisting at a newly acquired hotel in North Carolina when she received numerous complaints about Ms. Carter including being "nasty" to the Operations Manager and having harassed a black guest who was accusing her of racial discrimination (with which several co-workers agreed).

58.    Ms. Cavalier advised Ashley Lacourse, Brandt's Vice President of Operations of what was transpiring and they scheduled a call with Ms. Carter to discuss.

59.    The following day, Ms. Carter resigned her position.

60.    Ms. Cavalier soon discovered why: Ms. Cavalier was told by several employees that while Ms. Cavalier was gone, Ms. Carter had been engaging in other unprofessional behaviors including drinking with guests, being intoxicated at the Residence Inn, and being seen exiting a guest's room in the early morning.

61.    Soon after, Ms. Cavalier learned that Ms. Carter's resignation was not accepted and that Brandt promoted her to serve as a Field Sales Manager in Fargo, ND.

62.    Ms. Cavalier called Mr. Necastro to complain about the issue, stating that Ms. Carter was treated differently than other employees because she was a "young beautiful girl" and "I wouldn't get away with this."

63.    Mr. Necastro responded, "I'm sorry you feel that way."

8

64. Ms. Cavalier then called Mr. Martodam and similarly alleged that this employee was only saved from termination and promoted because she was "young and pretty."

65. Not only was this young attractive employee dealt with differently than Ms. Cavalier, Ms. Cavalier suspects that Brandt's issues with Ms. Cavalier were motivated, at least in part, from this incident and Ms. Cavalier's complaints that this woman was being promoted and treated differently than Ms. Cavalier would have been treated because she was "young" and "beautiful."

66. In fact, after Mr. Latzke was hired in October of 2021, during his first trip to Rhode Island to meet Ms. Cavalier in February of 2022, he focused almost exclusively on what had happened with Ms. Carter.

67. On September 5, 2023, Ms. Cavalier sent a Rebuttal to the Final Warning (the "Rebuttal") to Ms. Schmidt and Mr. Martodam as she was told she had the right to do.

68. In the Rebuttal, Ms. Cavalier detailed all the reasons why the Final Warning was without any merit as detailed above.

69. In addition, Ms. Cavalier expressly stated that she believed the Final Warning constituted discrimination against her based on her sex and age and noted that Ms. Carter, who has a long history of poor performance and unprofessional conduct, had been treated very differently by Brandt.

70. Ms. Cavalier expressly quoted the relevant anti-discrimination and anti-retaliation provisions of the Employee Handbook.

71. Eight days later, on September 13, 2023, Ms. Cavalier received an email scheduling a call on September 14th at 3:00 p.m. with Ms. Schmidt and Mr. Martodam.

72.    Given the allegations contained in the Rebuttal, Ms. Cavalier reasonably assumed the purpose of this meeting was to discuss and investigate her claims of discrimination.

73.    Instead, 10 minutes before the call, Ms. Cavalier was sent a document titled "Clarification of Expectations" wrongfully stating that Ms. Cavalier had issues with turnover at her hotel and communication with management and that Brandt had communicated these issues to her in the past.

74.    These claims are belied by the fact that in every single performance review, Ms. Cavalier had been scored "exceeds expectations" without a single mention of either of these alleged issues.

75.    The sole subject of the call was the Clarification of Expectations which, given the Final Warning, was unnecessary and excessive and had obviously been issued in retaliation for Ms. Cavalier's written allegations of discrimination.

76.    Mr. Martodam alleged that there was a "greater frequency" of terminations at Ms. Cavalier's hotel and, as such, she needed to discuss performance issues with management before terminating an employee.

77.    Ms. Cavalier made it clear that some of the relevant employees resigned and others were either terminated after in-depth communications with management or were terminated before Mr. Latzke was her supervisor and when Mr. Necastro (her prior supervisor) had no issues with the terminations.

78.    She also noted that Mr. Latzke also had communication issues since he often did not return her calls and issued a Final Warning, as opposed to a first warning, without first discussing any issues with her.

79.    Mr. Martodam agreed with this latter point and stated that he was in favor of changing the Final Warning to a "first warning" since Mr. Latzke had, by Mr. Martodam's own admission, not raised a single "communication" issue with Ms. Cavalier before issuing the Final Warning.

80.    Brandt has represented that it formally changed the Final Warning to a First Warning, but in later conversations, Mr. Martodam expressly told Ms. Cavalier that the Final Warning "should not have happened."

81.    Despite Ms. Cavalier's allegations of discrimination, the issue was barely mentioned.

82.    In fact, Mr. Martodam only stated "I don't know that [the Ms. Carter situation] has anything to do with [the Final Warning]."

83.    Ms. Cavalier reiterated that if she had all of the performance issues Ms. Carter had, she would not have been given a promotion and again wondered if she was promoted because she was "young and pretty."

84.    Mr. Martodam simply repeated that one situation had nothing to do with the other and refused to engage in the topic beyond that.

85.    Several days later, Ms. Cavalier sent them a Response to Clarification of Expectations.

86.    Ms. Cavalier noted that she had assumed the purpose of the call was to discuss her Rebuttal and allegations of discrimination and retaliation and that the information contained in the Clarification of Expectations was inaccurate.

87.    In addition, Ms. Cavalier noted that although Brandt seemed to take issue with Ms. Cavalier's perceived inability to retain managers at her hotel so that they could

continue to "grow" at Brandt, she had recently recommended that Ms. "Ormsby-Johnson (a late 30[s] year old Jamaican)" be promoted to General Manager but that Mr. Latzke refused.

88.    In fact, after numerous Assistant General Managers had either resigned or been fired for cause, Ms. Cavalier had found an Assistant General Manager that was performing excellently, making the timing of the Final Warning curious and further confirming Ms. Cavalier's belief that Brandt was not happy with Ms. Ormsby-Johnston's gender, race, and country of national origin.

89.    Ms. Cavalier ended the Response by stating that she took no issue with this requirement of more communication.

90.    After this, Ms. Cavalier kept her head down and did everything 100% in compliance with Brandt polices and these new directives.

91.    At no time did anyone ever contact Ms. Cavalier about her allegations of discrimination and, because of the Clarification of Expectations she received soon after she made her allegations, she was fearful of raising the issue again.

92.    Things generally quieted down for a few weeks but over time, Brandt renewed its hostility, harassment, discrimination, and retaliation against Ms. Cavalier.

93.    In late February of 2024, Ms. Cavalier began having issues with Josh Young, the Operations Manager at the Residence Inn.

94.    These issues would ultimately lead to Ms. Cavalier's termination.

95.    Ms. Cavalier had worked with Mr. Young for fifteen years and they had generally had a great working and personal relationship.

96.    Having already been reprimanded for not giving employees a sufficient amount of time to correct any performance issues, and reliant on her long-standing relationship

12

with Mr. Young, Ms. Cavalier verbally coached Mr. Young regarding some relatively small performance issues in late February.

97.     On March 12, Mr. Young had an angry outburst at Ms. Cavalier and Ms. Ormsby-Johnson (his two female superiors) regarding the hiring of a new laundry attendant.

98.     Ms. Cavalier and Ms. Ormsby-Johnson felt physically unsafe and extremely uncomfortable being screamed-at by Mr. Young.

99.     On March 15th, Ms. Cavalier drafted a written corrective action (the "Young Corrective Action") for Mr. Young but was hesitant to do more given Mr. Latzke's issues in the past and his claim that she was somehow responsible for turnover at the Residence Inn.

100.    Over the next couple of weeks, Ms. Cavalier received numerous additional complaints about Mr. Young from Ms. Ormsby-Johnson including unprofessional and insubordinate behavior toward her, other staff, and even guests.

101.    At this point, Ms. Cavalier suspected that Mr. Young was harboring some serious hostility toward Ms. Ormsby-Johnson which was interfering with his ability to perform his work in a professional manner.

102.    Ms. Cavalier discussed these issues numerous times with Mr. Latzke and Ms. Schmidt as they had previously directed her to do.

103.    Despite this, at this time, neither of them directed her to issue the Young Corrective Action or any other formal written reprimand.

104.    On March 29th, while Ms. Cavalier was away on vacation, Mr. Young sent several Microsoft Teams messages to Ms. Cavalier and Ms. Ormsby-Johnson about wine that mistakenly had been delivered to a neighboring hotel.

105.    Mr. Young refused to get the wine (which Ms. Cavalier had done several times in the past), suggesting that Ms. Ormsby-Johnson should do it.

106.    He also sent several unprofessional and insubordinate messages to them about the issue.

107.    Ms. Cavalier simply stated that they would "talk next week" and planned to speak with Mr. Latzke and Ms. Schmidt as soon as she was home from vacation,

108.    A half hour later, Mr. Young submitted his resignation.

109.    Ms. Cavalier immediately called and emailed Ms. Schmidt and they discussed what had transpired and what they should do next.

110.    Mr. Young then rescinded his resignation and on April 1st emailed Ms. Cavalier "deeply regret[ting]" his actions and expressing his "utmost respect and gratitude" to her.

111.    On April 3rd and April 4th, Ms. Cavalier had in-depth discussions with Ms. Schmidt and Mr. Latzke about the issues with Mr. Young and whether he would be allowed to rescind his resignation.

112.    Ms. Cavalier emailed her draft Young Corrective Action to them prior to a scheduled call on April 4th.

113.    She also forwarded a written complaint by Ms. Ormsby-Johnson about Mr. Young to them.

114.    On April 3rd, Ms. Schmidt emailed Ms. Cavalier a revised Young Corrective Action for Mr. Young and stated "[p]lease review so we can all discuss/prepare a final draft tomorrow."

115.    During their call on April 4th, Ms. Cavalier, based on numerous complaints about Mr. Young by Ms. Ormsby-Johnson and others, stated that she believed that Mr. Young should not be allowed to return to work.

116.    Mr. Latzke and Ms. Schmidt ultimately disagreed and instead directed Ms. Cavalier to issue the Young Corrective Action as revised by them, after his return to work.

117.    Importantly, in connection with proceedings before the Rhode Island Commission for Human Rights, Brandt contended that Ms. Cavalier's termination was primarily motivated by her issuance of this Young Corrective Action to Mr. Young allegedly without Brandt's knowledge or approval.

118.    Ms. Cavalier did as directed and discussed the Young Corrective Action with Mr. Young on April 9th, the next time they worked together.

119.    Mr. Young apologized profusely and indicated that he had personal issues affecting him and that he recognized that he had "anger issues."

120.    On April 17th, during a company conference, Mr. Latzke called Ms. Cavalier, in front of Ms. Cavalier's Director of Sales, Brandt's "red-headed stepchild."

121.    When the Director of Sales objected to this term, Mr. Latzke stated "it's ok, it's who she is."

122.    Ms. Cavalier's performance review with Mr. Latzke was scheduled to be held on April 25th.

123.    On April 24th, Ms. Cavalier logged into Brandt's payroll platform and noticed that she would be receiving a 4% raise which, besides a single part-time employee and Mr. Young who had almost not been allowed to return from work after his resignation and had

numerous performance and professionalism issues, would be the lowest raise of all employees at the Residence Inn.

124.    As such, Ms. Cavalier called Mr. Martodam to complain about the "red-headed stepchild" comment and her low raise.

125.    Ms. Cavalier expressly stated that she believed that the comment and the low raise constituted retaliation against her for having alleged discrimination and was further evidence of the discrimination she was facing.

126.    Mr. Martodam agreed that the raise was low and that she should expressly ask Mr. Latzke why.

127.    On April 25th, Mr. Latzke conducted his review of Ms. Cavalier's performance.

128.    He stated, yet again, that it was excellent, there were no changes from her last performance review, and that he had no issues with her whatsoever.

129.    He told her that she makes his job easier and is among the best General Managers in all of Brandt.

130.    When asked why she only received a 4% raise given her excellent performance, Mr. Latzke had trouble identifying any logical reason and promised to discuss the issue with Mr. Necastro.

131.    On May 1st, Mr. Latzke text messaged Ms. Cavalier to schedule a call the next day.

132.    He pretended that the call was just a simple "recap" of some issues and expressly told Ms. Cavalier that she did not need to prepare.

133.    Minutes before the May 2nd call, Mr. Latzke texted Ms. Cavalier that Ms. Schmidt would also be on the call and that they would "follow up on the [Mr. Young] thing."

134.    Ms. Cavalier later discovered from Ms. Schmidt that Mr. Latzke wanted to keep Ms. Schmidt's participation in the call a secret from Ms. Cavalier to which Ms. Schmidt objected and directed him to let Ms. Cavalier know.

135.    Ms. Cavalier found all of this very curious considering that she communicated with both of them as it concerned Mr. Young before she issued the Young Corrective Action (as they had revised and directed) and that the issue had seemingly been resolved, as evidenced by her excellent review, until she formally complained about Mr. Latzke again on April 24th.

136.    During the call, Mr. Latzke focused on what was causing Mr. Young to act up, suggesting that Ms. Ormsby-Johnson, a Jamaican woman, had done something wrong to receive Mr. Young's (a white male) abuse and resentment.

137.    Ms. Schmidt and Mr. Latzke began claiming that Ms. Cavalier should be more complimentary of Mr. Young and was somehow responsible for Mr. Young's unprofessional tirades against his two female superiors, other employees, and even guests.

138.    Instead of rightfully focusing the conversation on Mr. Young's behavior, Ms. Schmidt and Mr. Latzke continued suggesting that this was a "relationship" issue between Mr. Young and Ms. Ormsby-Johnson, even though Ms. Ormsby-Johnson had done nothing wrong and should not be held responsible for Mr. Young's behavior.

139.    At the end of the call, Mr. Latzke began blaming Ms. Cavalier's failure to communicate with them on the deterioration of Mr. Young and Ms. Ormsby-Johnson's

relationship, claiming that the first hint of trouble between the two of them was several weeks before Ms. Cavalier first drafted a reprimand for Mr. Young back in March.

140. Again, Ms. Cavalier had numerous conversations with other General Managers who told her that they never discussed reprimands with Mr. Latzke or Ms. Schmidt ahead of time and found it very curious that Ms. Cavalier was being micromanaged to such an extent.

141. Ms. Cavalier was especially baffled since she had sent Mr. Latzke and Ms. Schmidt the draft written reprimand, which they revised and expressly directed her to issue to Mr. Young.

142. She also was confused since she had been given the Final Warning for allegedly not giving an employee enough time to correct performance issues before writing her up and, as instructed, Ms. Cavalier had elected to verbally coach Mr. Young in February

143. Now she was being accused of doing the exact opposite and not writing him up early enough.

144. Importantly, at no time during this call did Mr. Latzke or Ms. Schmidt allege that Ms. Cavalier had issued the Young Corrective Action without their knowledge (which is the purported primary basis for Ms. Cavalier's termination).

145. Sensing that Mr. Latzke and Ms. Schmidt were once again turning what should have been an easy conversation about an angry and hostile employee into an unwarranted attack on Ms. Cavalier, she became emotional and began crying and they ended the call.

146. Fifteen minutes later, Ms. Cavalier called Ms. Schmidt and explained that her allegations against Mr. Latzke were never investigated or even discussed and that she has

been receiving discriminatory and retaliatory treatment for a while and believed that this latest alleged issue with Mr. Young was just more of the same.

147.    On May 6th, Mr. Young again angrily lashed out at Ms. Cavalier, this time about her utilization of the Executive Housekeeper.

148.    In light of Mr. Young's prior outbursts and the fact that he was a larger male and visibly angry, Ms. Cavalier called Ms. Ormsby-Johnson into the back office at which time Mr. Young said he was leaving and he wanted "nothing to do with" the two of them anymore.

149.    Mr. Young then sped out of the parking lot, presumably quitting again.

150.    Ms. Cavalier then called Ms. Schmidt and advised her of what had taken place.

151.    Ms. Schmidt claimed that Mr. Young had a different "account" of what had happened, so Ms. Cavalier told Ms. Schmidt that both Ms. Ormsby-Johnson and the front desk agent had witnessed the outburst and that she should speak with them.

152.    Ms. Cavalier then called and left a voicemail for Mr. Necastro who never called her back.

153.    She then called Mr. Martodam and advised him of everything that had happened since May 1st and that, since she had done everything precisely how she was supposed to, she believed this was retaliation for her prior complaints to him and others.

154.    He agreed that she did what she as she had been instructed and said that Mr. Latzke needed to "let you breathe" and was not doing a good job of communicating with Ms. Cavalier.

155. On May 7th, Ms. Cavalier spoke with Mr. Latzke who said he was scheduling a call with the two of them, Ms. Schmidt, and Mr. Young.

156. Ms. Cavalier explained she did not understand what the purpose of the call would be considering Mr. Young's behavior and told Mr. Latzke to speak with a number of witnesses to Mr. Young's various outbursts at staff and guests.

157. She also stated that she felt that her version of events was being questioned and that she did not trust Mr. Latzke's motivations in light of her prior complaints about discrimination and retaliation.

158. On May 8th, Ms. Cavalier, Mr. Latzke, Ms. Schmidt, and Mr. Young engaged in the required phone call.

159. Nothing fruitful was discussed and nobody alleged that Ms. Cavalier had done anything incorrectly.

160. Once again, nobody ever asserted that Ms. Cavalier had issued the Young Corrective Action without their knowledge and consent.

161. Later that day, Ms. Schmidt advised Ms. Cavalier that they were considering allowing Mr. Young to return to work yet again despite him having screamed at two female superiors (again) and having resigned (again).

162. Ms. Cavalier again objected and again advised Mr. Latzke that Ms. Ormsby-Johnson took issue with any such return to work and had submitted a written complaint about Mr. Young expressly stating that she felt that "the work environment is toxic and hostile due to [Mr. Young's] pattern of yelling/actions."

163. Ms. Cavalier was very mindful of the fact that Brandt would never have allowed either her or Ms. Ormsby-Johnson to act as Mr. Young did and was not only excusing his behavior but somehow holding them accountable for it.

164. Mr. Latzke and Ms. Schmidt then began purportedly investigating Mr. Young's actions and advised Ms. Cavalier that they would keep her updated.

165. On May 13th, Mr. Latzke and Ms. Schmidt called Ms. Cavalier and advised her that she was now also under investigation.

166. They provided no information relevant to this "investigation" beyond the fact that it was allegedly about Ms. Cavalier's "failure to communicate" with them about Mr. Young.

167. At no time did either of them ask Ms. Cavalier for any information to assist them in their "investigation."

168. Importantly, and unbeknownst to Ms. Cavalier at this time, Brandt had already, prior to this "investigation," told an out-of-state employee that he would be moving "east" to serve as the General Manager of the Residence Inn in Rhode Island.

169. On May 15th, Ms. Cavalier emailed Mr. Martodam, Mr. Necastro, and Ms. Schmidt asking why Mr. Latzke, who is the subject of her discrimination and retaliation complaints that were never investigated, was now "investigating" her for unknown reasons.

170. She detailed Brandt's discrimination, retaliation, and hostility toward her, her own excellent reviews and results, and the fact that it seemed she was being "pushed out" based on her complaints, including her most recent April 24th, May 2nd, and May 7th complaints.

171. Later that day, Ms. Schmidt called Ms. Cavalier and fired her.

172.    She stated that they initiated the investigation into Mr. Young but that they ultimately determined that they had been "looped in late" and that, given her alleged past "communication issues" and her and Mr. Latzke not being involved in discussions about reprimands and terminations of employees in the past, termination was appropriate.

173.    After she was terminated, Ms. Cavalier requested payment of her pro-rated quarterly bonus and the sales bonus for 2023 that she should have earned because she was serving as both General Manager and the Director of Sales.

174.    Brandt had previously paid Nick Nelson, a male General Manager in Thorton, CO, his bonus despite the fact that he had left Brandt's employ before the bonus was earned.

175.    Her request was denied without any reason.

176.    On May 20th, Ms. Cavalier was finally emailed her 2023 performance review, after she requested it during her termination.

177.    As discussed, Mr. Latzke did not raise any communication issues during the performance review meeting whatsoever and the written performance review did not contain any negative information about Ms. Cavalier's performance.

178.    Interestingly, in the written performance review, Mr. Latzke actually wrote that Ms. Cavalier "operates her hotel with very little Daily/Weekly oversight. Which has been a huge help at times for me. This allows me to focus on areas that need more of my attention like Openings and performance issues at other hotels. This has been a big help and I appreciate that."

179.    It is clear that Brandt's alleged rationale for terminating Ms. Cavalier is mere pretext.

180.    When terminating Ms. Cavalier, Ms. Schmidt essentially said that Ms. Cavalier allowed the situation with Mr. Young to deteriorate for too long without reprimanding him or otherwise correcting the behavior.

181.    However, Mr. Latzke's sole written reprimand in August of 2023 was that Ms. Cavalier was too quick to reprimand her employees.

182.    Meanwhile, Ms. Cavalier received an excellent performance review that expressly thanked her for requiring "little . . . oversight."

183.    She was placed in a no-win situation with conflicting directives and no written explanation of what Brandt required of her.

184.    Moreover, in connection with the proceedings before the Rhode Island Commission for Human Rights, Brandt alleged that Ms. Cavalier was terminated because it discovered in "late April 2024" that she had issued the Young Corrective Action to Mr. Young without Brandt's knowledge or approval.

185.    Yet, between this alleged discovery in "late April 2024" and August of 2024 when Brandt disclosed it as the basis for Ms. Cavalier's termination, no one at Brandt ever raised it as an issue.

186.    To the contrary, the sole issues ever raised in connection with Mr. Young was that Ms. Cavalier had not been proactive enough in coaching and reprimanding him.

187.    This is because the Young Corrective Action Ms. Cavalier issued had been revised by Ms. Schmidt and Mr. Latzke and they expressly directed her to issue it to Mr. Young.

188.    The actual reason for her termination was that Ms. Cavalier had complained, numerous times, of discrimination against her and others on the basis of age, sex, race, and country of national origin.

23

189. Even assuming "communication issues" were the real reason for her termination, Brandt took no such issues with male or younger female General Managers.

190. After she was fired, Mr. Nelson told Ms. Cavalier that he "wrote up" his Director of Sales six times without once telling Mr. Latzke or Ms. Schmidt and that when he recommended terminating him based on the multiple reprimands, neither of them raised any issues.

191. Other General Managers have also confirmed that they did not receive nearly the same level of micromanagement as Ms. Cavalier.

192. After she was fired, Ms. Cavalier also spoke with several employees at the Residence Inn, one of whom advised her that Mr. Latzke had told them that Ms. Cavalier's termination had nothing to do with Mr. Young and that it was based upon something that happened "before [Mr. Latzke] started working for Brandt."

193. This is likely a reference to Ms. Cavalier's complaints about the way Brandt handled the issues with Ms. Carter in 2021 and her continued issues with the fact that Ms. Carter had been granted latitude that an older or less "beautiful" employee would never be given.

194. Brandt also ignored its own disciplinary processes when it terminated Ms. Cavalier despite her excellent performance and having been issued only a single discriminatory and retaliatory reprimand which she promptly contested.

195. Mr. Young, a white man, had several poor performance reviews, a "final warning," two resignations, several angry outbursts and instances of insubordination, complaints from both of his female supervisors, other coworkers, and guests, and a history of unprofessional behavior.

196. Despite this, he was allowed to keep his job.

197.    Ms. Carter was given multiple reprimands, accused of racial discrimination, seen drinking with guests, and seen exiting guest rooms in the morning.

198.    Despite this, she was given a promotion.

199.    Brandt routinely gave male and younger employees numerous chances before terminating them.

200.    In fact, it was purportedly Ms. Cavalier's terminations of low performing and insubordinate employees that led to her Final Warning since she supposedly did not give them a sufficient number of chances.

201.    Finally, Ms. Cavalier had alleged that she was the victim of discrimination and retaliation numerous times throughout 2022 through 2024.

202.    Despite this, Brandt never investigated those claims, allowed the subject of her complaints to continue supervising her without any investigation, and then allowed that same subject of her complaints to conduct an "investigation" into her.

203.    Ms. Cavalier was treated differently because she was a woman, because she was approximately 50 years of age, and because she had verbally and in writing accused Brandt of discrimination and retaliation.

204.    After Ms. Cavalier's termination, Brandt replaced her as General Manager with Jonovan Authier, a male in his mid-30's with no experience as a General Manager for a Residence Inn, and paid him approximately $40,000 more per year.

205.    They did this despite the fact that Ms. Ormsby-Johnson, a woman of Jamaican descent, was qualified to serve as the new General Manager.

206.    According to several employees of the Residence Inn, Mr. Authier is performing poorly as the General Manager, was obviously not qualified to serve as a General

25

Manager, and the metrics and "scores" for the Residence Inn have gone down since he was placed in that position.

207.    Due to Brandt's unlawful discrimination and retaliation, Ms. Cavalier has suffered damages including loss of pay, loss of benefits, emotional distress, and humiliation.

208.    The actions by Brandt as detailed herein were intentional, arbitrary, unreasonable, tortious, willful, wanton, reckless and in bad faith.

209.    On or about June 18, 2024, Ms. Cavalier filed a written charge of discrimination and retaliation against Brandt (the "RICHR Complaint") with the Rhode Island Commission for Human Rights (the "Commission").  The Commission filed the RICHR Complaint with the United States Equal Employment Opportunity Commission (the "EEOC").

210.    On January 27, 2025, the Commission issued a notice of right to sue (the "RICHR Notice of Right to Sue") terminating the proceedings before the Commission and authorizing Ms. Cavalier to file suit under state law.

211.    On March 14, 2025, the EEOC issued a dismissal and notice of rights (the "EEOC Dismissal") terminating the proceedings before the EEOC and authorizing Ms. Cavalier to file suit under federal law.

### COUNT I
### (Fair Employment Practices Act – R.I. Gen. Laws § 28-5-1, *et seq.*)

212.    Ms. Cavalier repeats and realleges Paragraphs 1-211 as if set forth in full herein.

213.    Ms. Cavalier is an employee as that term is defined by R.I. Gen. Laws § 28-5-6.

214.    Brandt is an employer as that term is defined by R.I. Gen. Laws § 28-5-6.

215.    It was an unlawful employment practice for Brandt to terminate and otherwise discriminate against Ms. Cavalier on account of her gender and age.

216.    It was an unlawful employment practice for Brandt to discriminate and retaliate against Ms. Cavalier because she opposed and complained about unfair and unlawful employment practices against her and others.

217.    It was an unlawful employment practice for Brandt, in response to Ms. Cavalier's numerous complaints about being discriminated against on the basis of her sex and age, to refuse to investigate and disclose in a timely manner in writing to Ms. Cavalier the disposition of her complaints, including a description of any action taken in resolution of the complaints.

218.    As a result of these violations of law as described herein, Ms. Cavalier has suffered and continues to suffer damages.

## COUNT II
### (RI Civil Rights Act of 1990 – R.I. Gen. Laws § 42-112-2)

219.    Ms. Cavalier repeats and realleges Paragraphs 1-218 as if set forth in full herein.

220.    Brandt terminated and otherwise discriminated against Ms. Cavalier because of her sex and age.

221.    Brandt terminated and otherwise discriminated and retaliated against Ms. Cavalier because she complained about Brandt's discrimination against her and others because of her and their sex, age, race, and country of national origin.

222.    As a result of these violations of law as described herein, Ms. Cavalier has suffered and continues to suffer damages.

## COUNT III
### (Title VII of the Civil Rights Act of 1964 - 42 U.S.C. § 2000e-1, *et seq.*),

223.    Ms. Cavalier repeats and realleges Paragraphs 1-222 as if set forth in full herein.

224.    Brandt is an employer as that term is defined by 42 U.S.C. § 2000e-1.

225.    Ms. Cavalier is an employee as that term is defined by 42 U.S.C. §2000e-1.

226.    Brandt terminated and otherwise discriminated against Ms. Cavalier because of her sex and age and because she opposed and complained about unfair and unlawful employment practices against her and others.

227.    As a result of these violations of law as described herein, Ms. Cavalier has suffered and continues to suffer damages.

## COUNT IV
### (RI Whistleblowers' Protection Act – R.I. Gen. Laws § 28-50-1, *et seq.*)

228.    Ms. Cavalier repeats and realleges Paragraphs 1-227 as if set forth in full herein.

229.    Ms. Cavalier is an employee as that term is defined by R.I. Gen. Laws § 28-50-2.

230.    Brandt is an employer as that term is defined by R.I. Gen. Laws § 28-50-2.

231.    Brandt terminated, threatened, and otherwise discriminated against Ms. Cavalier because she complained about and reported, verbally and in writing, Brandt's unlawful discrimination and retaliation against her and others.

232.    The discrimination and retaliation against Ms. Cavalier and others violated state and/or federal law.

233.    Ms. Cavalier reasonably and in good faith believed Brandt's actions violated state and/or federal law.

234.    As a result of these violations of law as described herein, Ms. Cavalier has suffered and continues to suffer damages.

WHEREFORE Complainant Chellen Cavalier prays for judgment against Brandt including: an award of actual, compensatory, equitable, punitive, and liquidated damages in an amount to be set by the jury; attorneys' fees and costs; interest thereon; and such other and further relief as to the Court seems meet and just.

CHELLEN CAVALIER

By Her Attorney,

ENRIGHT LAW LLC

/s/ Thomas J. Enright
Thomas J. Enright (#7356)
696 Reservoir Avenue
Cranston, RI 02910
(401) 526-2620
(401) 457-7117  FAX
tom@enrightlawoffice.com

DATED:  April 1, 2025